UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION


CITY OF OCALA. a Florida municipal
corporation,

       Plaintiff,

-vs-                                   Case No.     5:12-cv-48-Oc-10PRL

SAFETY NATIONAL CASUALTY
CORPORATION. a Foreign corporation,

       Defendant.

                                              /


**MEMORANDUM OPINION**


      This case involves a dispute between the City of Ocala and Safety National

Casualty Corporation concerning the insurance coverage afforded by an Excess

Worker's Compensation and Employer's Liability Insurance policy issued by Safety

National to the City as its insured.

      The lawsuit is one brought by the City seeking a declaratory judgment and

other relief.  Jurisdiction exists under 28 U.S.C. §§ 1332 and 2201, and venue is

proper in this District and Division.  The case was tried and orally argued to the Court

sitting without a jury.

      In summary, the dispute is this:  the City of Ocala is self insured with respect

to worker's compensation claims made by its employees under Florida law up to

$500,000.00 in disbursed benefits.  The Safety National policy provides excess

coverage to the City for worker's claims exceeding $500,000.00. Among other things,

Case 5:12-cv-00048-WTH-PRL   Document 78   Filed 10/02/13   Page 2 of 17 PageID 1879

the policy requires the City to give notice to Safety National when the City encounters

a claim likely to reach the threshold of the excess coverage afforded by the policy.[1]

The City is also required to exercise diligence, prudence, and good faith in the

defense and settlement of all claims in their entirety.

In this instance the City was met with an excess claim – one likely to exceed

$500,000 – and admittedly failed to give timely notice to Safety National.  However,

under Florida law, that failure by the City does not automatically negate coverage

under the Safety National policy.  Rather, the lack of timely notice raises a rebuttable

presumption of prejudice to the insurer (Safety National) creating a defense to the

claim which the insured (the City) may overcome by proving a lack of prejudice in

fact.[2]  The principal issue the Court must decide is whether the City has proved a lack

of prejudice to Safety National due to the late notice of the claim.

There is also a second issue as to whether the City – apart from the untimely

notice – also breached its obligations under the policy by failing to exercise due

diligence and good faith in settling (or by not settling) the underlying claim (Doc. 31,

Joint Pretrial Statement, page 5, ¶ 11) thereby forfeiting the coverage afforded by the

policy to the extent of any payments Safety National would be required to make in

---

[1]     The policy requires, more specifically, that notice be given concerning any claim that exceeds, or is likely to exceed, $250,000.00 or where it appears that the worker's injury or disability will exceed one year in duration (Doc. 31, Joint Pretrial Statement, p. 4, ¶ 9 (e)).

[2]     The parties agree that Florida law supplies the rule of decision (Doc. 31, p. 5, ¶ 10) and that the Florida Supreme Court decision in Tiedtke v. Fidelity & Cas. Co. of New York, 222 So. 2d 206, 209 (Fla. 1968) is the governing decision adopting the principle of law stated in the text.

2

excess of the amount for which the underlying claim could have been settled if the City had acted in good faith.

Upon full consideration of all of the evidence and the arguments of counsel,[3] the Court concludes that the City has successfully proved that Safety National did not suffer any prejudice in fact attributable to the City's late notice of the underlying claim in dispute; and, further, that Safety National has not proved its defense of a lack of due diligence and good faith on the part of the City in not settling the underlying claim.

## **Discussion**

### A.    The City's Failure To Give Timely Notice Of The Remington Claim.

Theron Remington was a Fireman employed by the City of Ocala for more than 25 years.  In 1997, during his employment, Remington was diagnosed with serious heart disease and hypertension.  Under Florida law, specifically Fla. Stat. § 112.18, any municipal firefighter who suffers an impairment of health due to heart disease is vested with a statutory presumption that such impairment was accidental and suffered in the line of duty.  This means that a stricken firefighter such as Remington is eligible for worker's compensation benefits for the impairment of health resulting from his cardiovascular condition.[4]

On October 1, 2001, the City purchased from Safety National the excess insurance coverage at issue in this case.  On May 21, 2002, Remington had bypass

---

[3]    The case was litigated, tried and argued by able counsel for both parties.

[4]    On June 20, 2001, Remington filed his first claim for benefits stemming from his 1997 diagnosis of coronary artery disease.

surgery and was "taken off work." The surgery and Remington's removal from work as an active firefighter constituted a new incident for worker's compensation purposes, and the Parties agree that his claim resulting from those events arose during the coverage period of the Safety National policy (Doc. 31, p. 5, ¶ 9i).[5]

Remington never returned to work following his surgery, and in September, 2002, he was given a 29% permanent impairment rating by his treating physician (Trial Ex. 9).[6] In February, 2003, Remington's employment was terminated by the City because he did not wish to transfer to any other City agency and there were no positions within the Fire Department that he could perform given his medical/physical limitations.[7]

No notice had been given by the City or by its claims administrator[8] to Safety National concerning the existence of the Remington claim; and, according to Safety National – without dispute by the City – the date of May 21, 2003, the first anniversary

[5]    By agreement of counsel for the City and counsel for Mr. Remington made at the time of these events, the date of Remington's surgery (May 21, 2002) was the date of a new "accident" and resulting "disablement" under the worker's compensation law. (Trial Ex. 2).

[6]    A permanent impairment rating of 29% qualified Remington for supplemental benefits under the Florida Workers Compensation law.

[7]    Remington has been paid by the City, and is still being paid, Worker's Compensation benefits from the date of his surgery and removal from work in 2002. At the time of trial those payments totaled in excess of $600,000.00.

[8]    At all times material to the case the City contracted with a third party administrator, United Self Insured Services ("USIS"), to process claims and otherwise administer its worker's compensation program. With respect to its legal representation concerning any litigation of worker's compensation claims, the City was represented by attorney Betty Marion.

4

of Remington's absence from work due to disability, was the latest date that notice of the claim should have been given.

On March 8, 2006, Safety National conducted an audit of the City's pending worker's compensation cases as maintained in the offices of USIS.  During the course of that audit Safety National identified the Remington case as one that should have been reported as a claim that was likely to involve the excess coverage afforded by its policy.  This finding (as well as perceived problems with several other files) was then conveyed by Safety National in a letter to USIS dated June 27, 2006.  In response, USIS formally reported the Remington case to Safety National on July 28, 2006.

Thus, after July, 2006, Safety National was on notice of the pendency of the Remington claim and was in a position to monitor the claim and to exercise all of the rights it might have under the policy to participate in the management of the defense.[9]

---

[9]      The Safety National policy contains the following provision:

J.  Defense of Claims

The EMPLOYER shall investigate and settle or defend all claims and shall conduct the defense and appeal of all actions, suits, and proceedings commenced against it. The EMPLOYER shall forward promptly to the CORPORATION copies of any pleadings or reports as may be requested.    The CORPORATION shall not be obliged to assume charge of the investigation, defense, appeal or settlement of any claim, suit, or proceeding brought against the EMPLOYER, but the CORPORATION shall be given the opportunity to investigate, defend, or participate with the EMPLOYER in the investigation and defense of any claim, if, in the opinion of the CORPORATION, its liability under this Agreement might be involved.

If Safety National was prejudiced by the late notice, therefore, that prejudice would have to be causally related to some act or omission that occurred between May 21, 2003, when notice should have been given, and the end of July, 2006, when notice was afforded – a period of just over three years.[10]

Focusing on the evidence concerning the administration of the Remington claim by the City and USIS during that three year period, it does not appear that any action taken by the City or by USIS (or any inaction indulged by the City or by USIS) caused any injury or prejudice in fact to Safety National occurring either before or after the untimely notice in July, 2006.

Safety National argues that the City should have attempted to achieve a global settlement of Remington's claim while the City was still acting and paying out benefits within its "retention."[11]  The argument begins with a letter dated July 8, 2003, from Remington's attorney to Betty Marion in which the statement was made that "[i]f your client is interested in the option of a lump sum settlement, we would welcome discussions of that type.  Please advise of your client's position regarding settlement. If there is interest, I would be happy to prepare a demand for your consideration."

---

[10]     It is possible that such prejudice, if any, only became manifest after that three year period, but to support a defense (apart from the presumption in this case) it would have to be causally related to some act or omission that occurred during the time that notice should have been given concerning the existence of the claim.  Any mishandling of the claim by the City before or after that three year window of time might be germane to Safety National's lack-of-prudence defense, but would not be causally related to the lack of notice.  At oral argument, counsel for Safety National agreed with this approach.

[11]     The term "retention" is used in self insured/excess coverage matters to refer to the dollar amount of the liability retained by the insured as a self insurer before the excess insurance coverage is triggered or becomes effective.

(Trial Ex. 6).  The City did not respond and Remington's counsel made no demand. At trial, however, counsel for Remington testified that Remington was receiving temporary benefits in July, 2003, because he had not reached maximum medical improvement (MMI) and had not been accepted as PTD (permanent total disability) so that "[i]t's really premature to talk about overall resolution of the case until MMI has been established."[12]  Similarly, Ms. Marion testified that a global settlement would be premature before the Claimant reached maximum medical improvement, and she reasonably opined that the reference to settlement in 2003 would have related to the original claim in 1997 and Remington's temporary benefits he was receiving in 2003. In sum, there was no realistic probability of a global settlement of the entire case in July, 2003, by either the City or the Claimant Remington.

In March, 2004, at a time when Remington had been assigned a 29% disability rating by his physician thereby qualifying him for supplemental worker's compensation benefits, the City decided to accept Remington as permanently and totally disabled (PTD).  This step avoided what would otherwise have been an obligation to pay the supplemental benefits to Remington for 401 weeks.  At that time the anticipated total future indemnity benefits (wages) payable to Remington as PTD was $1,011,902.56, having a present value of $436,437.68.

Safety National argues that the acceptance of Remington as PTD was prejudicial to its interests because it committed the City – and Safety National – to the

---

[12]    Deposition of Geoffrey Bichler, attorney for Claimant Remington, admitted into evidence at trial.  (Doc. 48, p. 56).

payment of lifetime benefits when no effort had been made by the City to achieve a global settlement of the case within the City's retention.

This argument is unpersuasive, however, for two reasons.  First, Remington's medical condition was such that his status as permanently and totally disabled (PDT) appears to have been a foregone conclusion, and there was a reasonable and legitimate objective on the part of the City in declaring him PDT when it did so, namely, avoidance of the payment of supplemental benefits for a substantial period of time.

Secondly, there was still no reasonable prospect of a global settlement in any event.  At the time of Remington's termination as a City employee, he lost his medical insurance, and that factor immediately became one of paramount importance to him in the prosecution of his Worker's Compensation claim.  On October 15, 2004, Remington filed an unsuccessful petition seeking reinstatement of his health insurance as a worker's compensation benefit, and during a telephonic hearing concerning that petition held on February 9, 2005, Remington's counsel informed Betty Marion that "Mr. Remington does not have health insurance and does not want to settle until he does, but he is interested in settlement if we are."  (Trial Ex.19). Following that conversation, Remington's counsel never made a demand and the City never made an offer.

Apart from the health insurance issue standing as an impediment to Remington's desire to settle, there were three other factors at large in the case that

complicated and reduced the likelihood of any potential settlement during the period

prior to July, 2006, when notice was given to Safety National.  One such factor was

the matter of Remington's unresolved application for Social Security disability benefits

which, if awarded, would be applied to reduce his worker's compensation benefits.[13]

Another such factor was a petition filed by Remington in May, 2005, seeking

reimbursement of travel expenses incurred in going to and from his pharmacy

obtaining medication.[14]  Another factor being investigated by the City up to November,

2005, was the possibility of a fraud defense to the Remington claim based upon

information that Remington may have been working at other employment.[15]

In summary, all of the evidence points inexorably to the conclusion that the

Remington claim was not subject to any lump sum settlement prior to the time of the

notice to Safety National in late July, 2006, or, for that matter, at any time thereafter.

The lack of any actual prejudice to Safety National as a result of the late notice of the

Remington claim is also demonstrated by Safety National's own conduct after notice

was received.  First, in its initial letter of June 27, 2006 pointing out the Remington

case as one that should have been reported (Trial Ex. 25), no complaint of prejudice

---

[13]    Ultimately, Remington's petition for social security disability benefits was denied.

[14]    This claim, obviously, did not involve a significant sum of money in respect to Remington alone, but was an important issue to the City as applied to worker's compensation claimants in general.  The issue was litigated through the District Court of Appeal to the Supreme Court of Florida. Remington v. City of Ocala/United Self Insured, 940 So. 2d 1207 (Fla. 1st. Dist. Ct. App. 2006), review denied, 954 So. 2d 1155 (Fla. 2007).  The City lost.

[15]    Pursuit of this defense was abandoned after Betty Marion deposed Remington in October, 2005.

was expressed and the letter even concluded with the declaration that "[o]verall we found the handling of these claims to be satisfactory."[16] (Id.). Similarly, in January, 2007, six months after receiving formal notice of the Remington claim, Safety National corresponded with USIS and suggested that USIS "begin settlement negotiations with the claimant and his attorney at this time." (Trial Ex. 28). The letter also suggested that an initial offer of $150,000 be made in an effort to ultimately settle within a range of $190,000 to $289,000, "realiz[ing] and accept[ing] that the $500,000 Self-Insured Retention would be exceeded by approximately $45,000." (Id.). There was a followup letter to the same effect in March, 2007 (Trial Ex. 30) and there was no mention in either letter of any prejudice due to the lack of prior notice. Further, in Safety National's reservation of rights letter written on August 22, 2007 (Trial Ex. 52) the sole, stated basis of the reservation was the City's failure to settle the case in accordance with the letters from Safety National in January and March, 2007 (Trial Exs. 28 and 30). There was no mention of the late notice of the Remington claim. And, finally, in Safety National's letter of May 15, 2008 denying coverage of the Remington claim (Trial Ex. 67), the sole reason stated for such action was:

> As a result of the failure to make a good faith effort to settle this claim, Safety National cannot provide coverage for loss payments in excess of the amount this claim would have settled for had the Employer acted in good faith. (Id.)

---

[16]    In fairness, the quoted statement followed a discussion of a number of cases or files in addition to the Remington matter, and is not entitled to great weight. It is, however, of some probative value.

The Court concludes that Safety National was not prejudiced in fact by the City's untimely notice to it concerning the pendency of the Remington claim.  The presumption of prejudice caused by late notice has been rebutted, and the untimely notice will not be a defense in this action.

B.  The City's Lack Of Good Faith In Not Attempting To Settle.

In addition to Section J of the insurance policy quoted supra, note 9, obligating the City to "investigate and settle or defend all claims," the succeeding Section K of the policy (Trial Ex. 97) says:

> K.    Good Faith Claims Administration
> The EMPLOYER shall use diligence, prudence, and good faith in the investigation, defense and settlement of all such claims and shall not unreasonably refuse to settle any claim which, in the exercise of sound judgment with respect to the entire claim, should be settled, provided, however, that the EMPLOYER shall not make any payment or agree to any settlement for any sum which would involve the limits of the CORPORATION's liability hereunder without the approval of the CORPORATION. The EMPLOYER's failure to exercise diligence, prudence, and good faith may result in the disclaimer of coverage for the particular claim.

This clause is the basis of Safety National's reservation of rights on August 22, 2007 (Trial Ex. 52) and its subsequent denial of coverage of the Remington claim on May 15, 2008 (Trial Ex.67).  Significantly, however, in that letter, coverage was not denied in toto with respect to the Remington claim.  Rather, the letter appropriately stated that "Safety National cannot provide coverage for Loss payments in excess of the amount this claim would have settled for had the Employer acted in good faith." (Id.)

11

Testimony at trial revealed that, in practice, lump sum settlement of PDT Workers Compensation claims differs from the settlement of personal injury cases in general.  In Worker's Compensation cases there is no unquantified claim for pain and suffering.  The calculation of the claimant's indemnity benefits is fixed by the law, subject to quantifiable offsets such as social security benefits once those benefits (or the lack of them) have been established.  The only variable is the claimants' life expectancy.  Opposing lawyers in the field routinely evaluate cases using the same calculations and mortality tables, and arrive at similar results.  They begin to differ when they come to reducing future benefits to present value (due to the use of different discount rates), but those differences are usually resolved by selecting an evaluation of present value in the middle of the range.  The decision to settle on the part of the claimant will be influenced primarily by his family finances and the state of his individual health. Worker's Compensation benefits terminate at death.  A claimant whose case has a present value of hundreds of thousands of dollars has an incentive to accept a lump sum settlement for the benefit of his family and/or his estate (or his own immediate enjoyment) rather than risk the loss of that money in the event of an early death.  Because of that incentive, however, lump sum settlements are usually made in amounts somewhat below the estimated present value of the claim.

On the other hand, with respect to medical benefits and future medical care, a claimant like Remington with no health insurance and a heart condition requiring ongoing and expensive medical treatment might well opt to forego any lump sum payment and elect, instead, to continue receiving his periodic benefits including

medical care.  And, in this case, that is precisely what Remington elected to do.  He never made a lump sum settlement demand (until 2011), and he credibly testified at trial that while he would have listened to any offer that might have been made and would have followed the advice of his lawyer, he was disinclined to settle his claim for a lump sum present value because of his lack of health insurance and his concern about his future medical expenses.

Safety National's argument that the City lacked good faith in attempting to settle is predicated primarily on the fact that the City never made an offer of settlement to Remington in response to Safety National's previously mentioned letters to USIS dated January 4 (Trial Ex. 28) and March 16, 2007 (Trial Ex. 30), respectively, as well as to other inquiries about settlement made by Safety National running up to the reservation of rights letter on August 22, 2007 (Trial Ex. 52).

In the January, 2007 letter (Trial Ex. 28), Safety National estimated the present value of the Remington claim to be $458,000 with a settlement value of up to $289,000.  Safety National suggested an initial settlement offer of $150,000.  At trial, however, Remington's attorney testified that he would not have recommended settlement of the case at that time for any amount within the range suggested by Safety National.[17]  Further, there is evidence that the City did attempt to open meaningful settlement discussions with Remington in June of 2007, working around

---

[17]     This testimony is corroborated by the fact that he – Remington's attorney – never made a demand until 2011, and the amount of that demand was $932,078.39 (Trial Ex. 89).  Also, he has no apparent bias insofar as this litigation is concerned because his client will get his due regardless of the outcome of this case.

Remington's lack of medical insurance as an ongoing impediment to a global settlement. On June 26, 2007, counsel for the City corresponded with counsel for Remington (Trial Ex. 46) and recounted the substance of a conversation they had on June 20, 2007:

> Regarding settlement, Mr. Remington apparently did not have health insurance outside of his workers' compensation benefits, so you stated that he would not be interested in settlement because he would not have a way to treat for his injuries. I inquired whether he would be interested in settlement separate from future medicals, and you confessed that your client may be interested in this type of arrangement. Once you have had an opportunity to discuss this with your client, please present us with a demand and we will work on settling the claim outside of entitlement of future medical care. (Id.).

There is no evidence that counsel for Remington responded by making a demand; and, after receiving the reservation of rights letter from Safety National on August 22, 2007 (Trial Ex. 52), the City and USIS decided in January, 2008, that no offer would be made on Remington's claim (Trial Ex. 66). At that time approximately $175,000 remained in the City's retention (Trial Ex. 25).

The case was mediated in 2011. Remington's final demand at the mediation was $550,000 and the City's final offer was $350,000 (Trial Ex. 91). No settlement has been made to this day. The City's retention was exhausted in 2012. Safety National's argument of bad faith essentially rests upon the contention that the City intentionally dragged its feet and did not aggressively pursue the possibility of a global settlement while its retention remained unexhausted because, for reasons of funding, it was easier for the City to disburse the benefits over time than to pay out the remainder of the retention (or a substantial portion of it) in a lump sum. There are two

items of evidence relied upon by Safety National in support of this argument.  One is

the decision by USIS and the City in January, 2008 (Trial Ex. 66) not to make a lump

sum offer on the Remington claim because of the reservation of rights previously

asserted by Safety National on August 22, 2007 (Trial Ex. 52).  The other item of

evidence consists of documentation from another case in January, 2006, not the

Remington matter, in which the City sought a legal opinion with respect to the City's

obligation to settle claims when the excess carrier "pushes toward it." (Trial Ex. 23).[18]

This evidence is not persuasive and does not preponderate in favor of a finding

of bad faith.  Rather, it is clear that the City had a good faith belief throughout the

administration of the Remington claim that he was not interested in a global settlement

because of his lack of medical insurance; and when the City invited a demand for

settlement of the indemnity portion of the claim apart from his medical benefits, no

demand was forthcoming.  In hindsight, the City might have been more aggressive or

proactive in response to the Safety National requests regarding settlement; but, by the

same token, Safety National could have exercised its rights under Section J of the

policy with more force and specificity than it did following its lone, initial suggestion

that an offer of $150,000 should be made.

---

[18]     The City objected to the exhibit and the objection was carried with the case.  The objection is now overruled.  However, the Court assigns very little probative value to the exhibit as evidence of bad faith.  First, the matter arose in another case as a singular event, not a recurring practice, and the evidence does not demonstrate the degree of similarity between the circumstances of that case and the Remington claim.  Secondly, the advice given by counsel on that occasion was that "claims should be evaluated and administered upon their merits as opposed to budgetary considerations. . . ." (Trial Ex. 23).  There is no evidence that the City later disregarded that advice in handling the particular circumstances surrounding the Remington claim.

Besides, even if there was a lack of good faith on the part of the City, there is no evidence of resulting prejudice or damage to Safety National.  As stated by Safety National itself in denying coverage (Trial Ex. 67), coverage was declined "for loss payments in excess of the amount this claim could have been settled for had the Employer acted in good faith."[19]  There is not one scintilla of evidence in this record that the Remington claim could have been settled at any time for any stated amount within the City's retention.

## Conclusion

The Court concludes with respect to the issues framed by the Parties' Joint Pretrial Statement (Doc. 31) that:  (1) the City's failure to give timely notice of the Remington claim to Safety National did not cause any prejudice in fact to Safety National, and the presumption of prejudice due to the lack of timely notice has been rebutted and overcome by the City; and (2) that the City did not administer the Remington claim in bad faith or with a lack of prudence regarding settlement or attempted settlement of the claim, or, alternatively, Safety National did not suffer any proven injury, prejudice, or damage in consequence of any violation by the City of its obligations under the policy concerning administration of the Remington claim.

Judgment will be withheld pending resolution of all remaining issues in this case.  The Clerk is directed to schedule a status conference with counsel for the

---

[19]     Safety National's argument that it was prejudiced by a "lost opportunity" to settle fails for two reasons.  First, the argument is inconsistent with its own denial of coverage; and, secondly, there is no evidence of any such opportunity.

purpose of establishing the issues that remain and the proceedings necessary to resolve them.

IT IS SO ORDERED.

DONE AND ORDERED in Ocala, Florida this 2d day of October, 2013.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
             Maurya A. McSheehy

17